**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| BUILDERS INSURANCE (a Mutual Captive Company); AMERICAN BUILDERS INSURANCE COMPANY; and NATIONAL BUILDERS INSURANCE COMPANY,<br>     Plaintiffs,<br><br>          v.<br><br>MAIDEN REINSURANCE NORTH AMERICA, INC.,<br>          Defendant. | Civil Action No.<br>1:19-cv-02762-SDG |

### ORDER

This matter is before the Court on Defendant's Motions to Compel Arbitration and Dismiss with Prejudice All Claims Against Maiden Reinsurance North America, Inc. [ECF 3]; to Amend Case Caption [ECF 24]; and for Leave to Respond to Plaintiffs' Notice of New Authority [ECF25]. For the reasons stated below, Defendant's motion to compel [ECF 3] is **GRANTED** in part and **DENIED** in part. The parties are **DIRECTED** to arbitrate Plaintiff's claims. Defendant's motions to amend the case caption [ECF 24] and for leave to respond to Plaintiffs' new authorities [ECF 25] are **GRANTED**.

## I.   BACKGROUND

This dispute stems from Defendant Maiden Reinsurance North America, Inc.'s (MaidenRe) alleged bad-faith refusal to pay a claim made by Plaintiffs under various reinsurance policies to which MaidenRe subscribed. Plaintiffs are Builders Insurance (a Mutual Captive Company), American Builders Insurance Company, and National Builders Insurance Company. They are collectively referred to herein as "Builders."[1] The two pertinent questions the Court faces on MaidenRe's motion are: (1) Is MaidenRe a "Run-Off Reinsurer" under the relevant reinsurance policies? and (2) Should this Court or the arbitrator make that determination?

Before delving into these legal matters, an overview of the origin of this dispute and the reinsurance policies at issue is necessary.[2] Builders issued five successive, annual commercial general liability insurance policies to Vista Ridge Development, LLC and Chartered Homes of Colorado (collectively, Vista Ridge).[3] Each policy was effective from August 1 of a year to August 1 of the subsequent year: The first policy was in effect from August 1, 2011 to August 1, 2012; the

---

[1]   ECF 1-1, at 1 (collectively defining Plaintiffs as "Builders").

[2]   The Court takes the facts in this Background section from the allegations in the Complaint and the parties' briefing on the motion to compel arbitration. Unless otherwise indicated, there is no dispute about the facts.

[3]   ECF 1-1, ¶ 9.

second policy in effect from August 1, 2012 to August 1, 2013; and so on.[4] These are the "Builders Policies."[5]

The insured under the policies, Vista Ridge, was the developer of and general contractor for a development project of single-family homes.[6] Eventually, Vista Ridge was sued because of property damage allegedly caused by construction defects in those homes.[7] This is the "Underlying Lawsuit."[8] Evidence in the Underlying Lawsuit indicated that significant damage occurred during the policy periods of the Builders Policies.[9] Accordingly, Builders defended Vista Ridge in the Underlying Lawsuit.[10] On December 18, 2018, Builders paid $7.2 million to settle the Underlying Lawsuit and secure a release of Vista Ridge.[11]

As a way of spreading risk,[12] Builders purchased a series of reinsurance policies subscribed to by various groups of reinsurers to cover "a certain

---

[4]    *Id.*

[5]    *Id.*

[6]    *Id.* ¶ 10.

[7]    *Id.* ¶ 11.

[8]    ECF 1-1.

[9]    *Id.* ¶ 12.

[10]   *Id.* ¶ 13.

[11]   *Id.* ¶ 15.

[12]   .

percentage of Builders' exposure above its self-insurer retention for each policy period."[13] In common parlance, then, Builders bought policies to insure itself against risk it might face because of insurance policies Builders itself had issued.[14] MaidenRe was one of a group of reinsurers that subscribed to the reinsurance policies purchased by Builders (the Subscribing Reinsurers).[15]

As with the Builders Policies issued to Vista Ridge, the reinsurance policies at issue here were effective for five successive, annual periods: from January 1, 2011 to January 1, 2012; from January 1, 2012 to January 2013; and so forth, with the last relevant reinsurance policy in effect from January 1, 2015 to January 1, 2016.[16] These are the "Reinsurance Policies." Each of those policies is identical in most respects material to MaidenRe's motion to compel and each contains an arbitration clause.[17] When Builders paid to settle the Underlying Lawsuit, it made

---

[13]  *Id.* ¶ 16; ECF 7, at 4.

[14]  *Reinsurance*, A Handbook of Business Law Terms (1999) ("Insurance of all or part of one insurer's risk by a second insurer, who accepts the risk in exchange for a percentage of the original premium."); *reinsurance*, Black's Law Dictionary (6th ed. 1990) ("A contract by which an insurer procures a third person to insure him against loss or liability by reason of original insurance. . . . It binds the reinsurer to pay to the reinsured the whole loss sustained in respect to which he is reinsured.").

[15]  ECF 1-1, ¶¶ 16–17.

[16]  *Id.* ¶ 17.

[17]  *Compare generally* ECF 1-1, Compl. Exs. A, B, C, D, E.

claims under the Reinsurance Policies in an attempt to recover some of its losses. In early December 2018, shortly before making the payment to settle the Underlying Litigation, Builders provided a variety of information to MaidenRe (among other reinsurers) about the Vista Ridge claim.[18]

On December 27, 2018, MaidenRe was acquired by Enstar Group Limited (Enstar).[19] On January 17, 2019, Builders made a demand for payment from MaidenRe in connection with the Vista Ridge claim.[20] MaidenRe did not request additional information from Builders concerning that claim. Nor did MaidenRe make payment to Builders within 30 days of the January 17 demand, as Builders argues was required under the Reinsurance Policies.[21]

From February 25 through March 18, 2019, Builders and MaidenRe's agent (Cranmore US, also a subsidiary of Enstar) engaged in several communications

---

The differences among the policies that are pertinent to the parties' dispute are discussed *infra* at Section II.b.

[18]    ECF 1-1, ¶¶ 23–24.

[19]    *Id.* ¶¶ 19–20.

[20]    *Id.* ¶ 25.

[21]    *Id.* ¶ 28.

related to the Vista Ridge claim and Builders' demand.[22] Cranmore ceased responding to Builders' communications on March 22, 2019.[23]

On May 20, 2019, Builders filed suit in the State Court of Cobb County, Georgia.[24] The Complaint asserts causes of action against MaidenRe for (1) breach of contract and (2) bad faith refusal to pay claims under O.C.G.A. § 33-4-6. The Complaint seeks $1,970,000—the portion of the settlement payment on the Underlying Lawsuit allegedly attributable to MaidenRe—and bad faith damages.[25] On June 10, 2019, MaidenRe paid $1,9700,000 to Builders in connection with the breach of contract claim.[26]

On June 18, 2019, MaidenRe timely removed the action to this Court based on diversity jurisdiction.[27] Builders Insurance is incorporated and headquartered in the State of Georgia.[28] Builders Insurance wholly owns Builders Insurance

---

[22]  *Id.* ¶¶ 29–35.

[23]  *Id.* ¶¶ 35–36.

[24]  ECF 1-1.

[25]  *Id.* ¶¶ 42, 54.

[26]  ECF 3-2 (Declaration of Michael Sheehan (Sheehan Decl.)), ¶ 12.

[27]  ECF 1, at 1, ¶ 5.

[28]  *Id.* ¶ 6; ECF 1-1, ¶ 1.

Group, Inc. (which is not a party to this action).[29] Plaintiffs American Builders Insurance Company and National Builders Insurance Company are both incorporated in Delaware and headquartered in Georgia; they are wholly owned subsidiaries of Builders Insurance Group, Inc., and thus indirectly owned by Builders Insurance.[30] MaidenRe is incorporated in Missouri and has its principal place of business in New Jersey.[31] Therefore, there is complete diversity among the parties and the amount in controversy exceeds $75,000.[32]

On June 25, 2019, shortly after having removed the case, MaidenRe responded to the Complaint by filing the motion to compel arbitration.[33] It contends that the parties' entire dispute must be arbitrated based on the arbitration clause in the Reinsurance Policies. It further argues that the arbitration clauses are sufficiently broad to require that threshold issues of arbitrability be determined by the arbitrators; that is, MaidenRe contends the parties have delegated to the arbitrators the issue of arbitrability.[34]

---

[29]   ECF 1-1, ¶ 2.

[30]   ECF 1, ¶ 7; ECF 1-1, ¶¶ 1–3.

[31]   ECF 1, ¶ 8; ECF 1-1, ¶ 4.

[32]   ECF 1, ¶¶ 9–10.

[33]   ECF 3.

[34]   *Id.*

On July 9, 2019, Builders filed its opposition to MaidenRe's motion.[35] Among other things, Builders asserts that the arbitration provisions of the Reinsurance Policies no longer apply because MaidenRe is a Run-Off Reinsurer as defined in the policies.[36] Both parties supplemented their briefs with various declarations and supporting exhibits.[37]

On July 23, 2019, MaidenRe filed a reply in support of its motion.[38] On December 5, 2019, the Court heard oral argument by counsel for the parties. On February 3, 2020, Builders filed a notice of new authority, identifying decisions from other courts concerning arbitration that were issued after the December 5 oral argument.[39] On February 12, 2020, MaidenRe filed a motion for leave to respond to Builders' new authorities, which attached the proposed response.[40] Because the Court has reviewed and considered the new authorities presented by Builders, it **GRANTS** MaidenRe leave to file the response. The Clerk is

---

[35]   ECF 7.

[36]   ECF 1-1, ¶¶ 16–22; ECF 7, at 1.

[37]   ECF 3-2, 7-1, 7-3, 7-5, 7-7.

[38]   ECF 11.

[39]   ECF 23 (citing *Cabezuela v. W. Ref. Gp., LLC*, CV 19-355 MV/GBW, 2019 WL 7115420 (D.N.M. Dec. 23, 2019) and *Hobbs v. Apollo Interactive, Inc.*, Case No. 4:19-cv-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019)).

[40]   ECF 25, 25-1.

**DIRECTED** to file the proposed response [ECF 25-1] separately on the docket in response to Builders' notice of filing [ECF 23].

Also on February 12, 2020, MaidenRe filed a motion to amend the case caption. It represents that, after the initiation of this litigation, it changed its name to Fletcher Reinsurance Company.[41] It further represents that Fletcher Reinsurance Company has the "same rights and obligations" as MaidenRe.[42] Builders did not file a response to this motion and it is therefore unopposed. LR 7.1(B), ND Ga. Accordingly, MaidenRe's motion to amend the case caption is **GRANTED**. The Clerk is **DIRECTED** to change the name of Defendant in the case caption and on the docket to "Fletcher Reinsurance Company f/k/a/ Maiden Reinsurance North America, Inc." This Order, however, will continue to refer to Defendant as "MaidenRe" since that is the moniker used by the parties in briefing the motion to compel arbitration.

## II.    POLICY TERMS

As noted above, each of the five Reinsurance Policies contains nearly, but not exactly, identical language in the sections that are relevant here—Article 27 (Run-Off Reinsurer) and Article 28 (Arbitration).

---

[41] ECF 24.

[42] *Id.* at 2.

**a.      Article 27 — Run-Off Reinsurer**

For the policy in effect from January 1, 2011 to January 1, 2012, Article 27(A)

states in pertinent part:

> A. "Run-off Reinsurer" means any Subscribing Reinsurer that:
>
> . . . .
>
> 2. has ceased reinsurance underwriting operations; or
>
> 3. has transferred its claims-paying authority to an unaffiliated entity; or
>
> . . . .
>
> 5. in any other way has assigned its interests or delegated its obligations under this Contract to an unaffiliated entity.[43]

If one of the Subscribing Reinsurers became a "Run-Off Reinsurer," this would

trigger certain rights for Builders:

> B. Notwithstanding any other provision of this Contract, in the event that a Subscribing Reinsurer becomes a Run-off Reinsurer at any time, the Company [*i.e.*, Builders] may elect, by giving written notice to the Run-off Reinsurer at any time thereafter, that all or any of the

---

[43]  ECF 1-1, at 36–37. These are the only Run-Off Reinsurer definitions on which Builders relies in its opposition to MaidenRe's motion to compel arbitration. ECF 7, at 12.

Capitalized terms not otherwise defined herein have the definition ascribed to them in the Reinsurance Policies.

following shall apply to the Run-off Reinsurer's participation hereunder:

> 1. If the Run-off Reinsurer does not pay a claim or raise a query concerning the claim within 30 days of billing, it shall be estopped from denying such claim and must pay immediately.
>
> . . . .
>
> **7. The provisions of the Arbitration Article [Article 28] shall not apply.**[44]

Article 27(A) and (B) of the policies effective for the periods from January 1, 2012 to January 1, 2013; January 1, 2013 to January 1, 2014; January 1, 2014 to January 1, 2015; and January 1, 2015 to January 1, 2016 all contain the exact language quoted above.[45]

### b.   Article 28—Arbitration

#### i.   January 1, 2011 to January 1, 2012 Policy

For the policy in effect from January 1, 2011 to January 1, 2012, Article 28(A) states in pertinent part:

> A. Any dispute arising out of the interpretation, performance or breach of this Contract, including the formation or validity thereof, shall be submitted for decision to a panel of three arbitrators. . . .[46]

---

[44]   ECF 1-1, at 37–38, Article 27(B) (emphasis added).

[45]   *Id.* at 79–81, 119–121, 160–162, 201–03.

[46]   *Id.* at 38.

>     ii.     **Subsequent Policies**

Importantly, Article 28(A) of the policies for the years 2012 through 2015

contains more specific language:

> ***Except as provided in the Special Termination,
> Commutation and Run-Off Reinsurer Articles,*** any
> dispute arising out of the interpretation, performance or
> breach of this Contract, including the formation or
> validity thereof, shall be submitted for decision to a panel
> of three arbitrators. . . .[47]

Only the Run-Off Reinsurer Article is at issue here.

## III.   APPLICABLE LEGAL STANDARDS

### a.    Choice of Law

In an action where subject matter jurisdiction is premised on diversity of

citizenship, a federal court "must apply the controlling substantive law of the

state" in which it sits. *Cambridge Mut. Fire Ins. Co. v. City of Claxton, Ga.*, 720 F.2d

1230, 1232 (11th Cir. 1983) (*citing Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). As a

result, the Court must apply substantive Georgia law to the parties' dispute—

including Georgia's choice of law provisions. *Broyles v. Bayless*, 878 F.2d 1400, 1402

(11th Cir. 1989). Under Georgia law, "contractual choice-of-law provisions will be

enforced unless application of the chosen law would be contrary to the public

---

[47]    *Id.* at 81, 121, 162, 203 (emphasis added).

policy or prejudicial to the interests of this state." *Nat'l Freight, Inc. v. Consol. Container Co., LP*, 166 F. Supp. 3d 1320, 1326 (N.D. Ga. 2015) (qu*oting CS–Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 428 (2008)). Here, the Reinsurance Policies contain a Georgia choice of law provision.[48] The parties do not dispute the applicability of Georgia law. None has suggested the application of Georgia law would violate public policy or be prejudicial to the interests of any state.[49]  Accordingly, he contractual choice of law provisions are valid and Georgia law applies to the interpretation of the Reinsurance Policies. Under Georgia law, "[t]he construction of a contract is a question of law for the court." O.C.G.A. § 13-2-1.[50]

### b.   Arbitrability

The Supreme Court has made clear that "the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted). Unless parties have agreed otherwise, questions of arbitrability are to be made by the

---

[48]   *Id.* at 40, 83, 123, 164, 205 (Article 30, Governing Law).

[49]   *See generally* ECF 3, 7, 11.

[50]   *See also First Options*, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.") (citations omitted).

court. *First Options*, 514 U.S. at 943; *AT&T Techs., Inc. v. Comm'ns Workers*, 475 U.S. 643, 649 (1986). *See also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, (2019) ("The [Federal Arbitration] Act allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes.") (citations omitted).

There must be clear and unmistakable evidence that the parties intended for the arbitrators, rather than the court, to determine arbitrability. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'") (quoting *AT&T Techs.*, 475 U.S. at 649). If such evidence is lacking, the court "should not assume that the parties agreed to arbitrate arbitrability." *Howsam*, 537 U.S. at 83 (quoting *AT&T Techs.*, 475 U.S. at 649). Where the parties have done so, arbitrability has been "delegated."

Contrary to MaidenRe's assertions,[51] therefore, the question about *who* must decide whether a dispute is subject to arbitration is not weighed in favor of delegation unless there is clear and unmistakable evidence otherwise. This is in

---

[51]   ECF 11, at 14–16.

contrast to the presumption in favor of arbitration when determining whether the substance of a particular dispute must be arbitrated. "In this manner the law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption." *First Options*, 514 U.S. at 944–45 (citations omitted). *See also AT&T Techs.*, 475 U.S. at 650 (*quoting Steelworkers v. Warrior & Gulf, Nav. Co.*, 363 U.S. 574, 582–85 (1960)).

## IV.   DISCUSSION

The parties' respective positions are fairly straightforward. They do not dispute that the Reinsurance Policies are valid contracts that contain an otherwise valid arbitration clause.[52] Nor do they dispute that, *if* MaidenRe is a Run-Off Reinsurer, their dispute is *not* subject to arbitration.[53] Rather, they dispute whether MaidenRe *is* a "Run-Off Reinsurer." This matters because, if the answer is "yes," the parties must litigate their dispute in court.[54] Further, the parties dispute

---

52   *See generally* ECF 3-1, 7, 11.

53   ECF 3-1, at 6–7 (acknowledging limited exception to arbitration requirement for "Run-Off Reinsurers"). *See generally* ECF 3-1, 7, 11.

54   ECF 1-1, at 37–38, 81, 121, 162, 203.

whether the Reinsurance Policies delegate this issue to the arbitrators. The parties' respective failures to focus on the exact policy language informs their disagreement.

### a. The Court, Not the Arbitrators, Must Decide Whether MaidenRe Is a Run-Off Reinsurer.

MaidenRe's motion to compel asserts that the Reinsurance Policies have a delegation provision that requires the arbitrators to determine arbitrability. It claims the broad scope of the arbitration clauses requires all threshold questions to be arbitrated.[55] In making this argument, however, MaidenRe conspicuously ignores the exact language used in the policies.

Absent clear and unmistakable evidence that the parties intended to submit to the arbitrators disputes related to Article 27 (Run-Off Reinsurer), it would be error for the Court to compel the parties to arbitrate that issue. *Henry Schein, Inc.*, 139 S. Ct. at 530; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) ("[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*.") (citations omitted); *Howsam*, 537 U.S. at 83; *AT&T Techs.*, 475 U.S. at 649. Nor is there any federal policy favoring arbitration in deciding whether parties have agreed to delegate the

---

[55]   ECF 3-1, at 10–13.

question of arbitrability. *First Options*, 514 U.S. at 944–45; *AT&T Techs.*, 475 U.S. at 650. The evidence here indicates that the parties did not intend to delegate arbitrability questions concerning the Run-Off Reinsurer article.

### i. Policies Covering January 1, 2012 to January 1, 2016

"To satisfy itself that [an] agreement [to arbitrate a particular dispute] exists, the court must resolve any issue that calls into question the . . . specific arbitration clause that a party seeks to have the court enforce." *Granite Rock*, 561 U.S. at 297. "[I]n 'circumstance[s] where contracting parties would likely have expected a court to have decided the gateway matter,' we assume that is what they agreed to. . . . '[u]nless the parties clearly and unmistakably provide otherwise.'" *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010) (quoting *Howsam*, 537 U.S. at 83; *AT&T Techs.*, 475 U.S. at 649). Here, this means that the Court must determine whether there is clear and unmistakable evidence that the parties intended to delegate to the arbitrators the authority to determine if MaidenRe is a "Run-Off Reinsurer." The Court concludes there is not.

For the policies applicable from January 1, 2012 forward, the language of Article 28 (Arbitration) explicitly excludes the possibility that arbitrators should decide whether MaidenRe is a Run-Off Reinsurer:

> ***Except as provided in the*** Special Termination, Commutation and ***Run-Off Reinsurer Articles,*** any

> dispute arising out of the interpretation, performance or breach of this Contract, including the formation or validity thereof, shall be submitted for decision to a panel of three arbitrators. . . .[56]

By its clear language, this exception specifically removes matters related to the interpretation of Article 27 from consideration by the arbitration panel. MaidenRe does not address in its motion or reply brief how this exception can be read otherwise.

Article 27 provides: "Notwithstanding any other provision of this Contract, in the event that a Subscribing Reinsurer becomes a Run-Off Reinsurer at any time . . . . The provisions of the Arbitration Article [Article 28] shall not apply."[57] Articles 27 and 28 together reinforce one another and make clear that the parties did *not* intend for disputes concerning the applicability of the Run-Off Reinsurer article to be determined by arbitrators. At the very least, these provisions prevent the Court from concluding that there is clear and unmistakable evidence of the parties' intent to delegate to the arbitrators the decision of whether MaidenRe is a Run-Off Reinsurer.

---

[56]   ECF 1-1, at 81, 121, 162, 203 (emphasis added).

[57]   *Id.* at 37–38, 80–81, 120–21, 161–62, 202–03.

Nor does MaidenRe argue until its reply brief that this specific question has been delegated, claiming "the parties agreed that 'any' dispute relating to the interpretation of the [Reinsurance Policies] *must* be resolved by reinsurance industry experts."[58] For the reasons stated above, the Court rejects this argument. Regardless of whether the arbitration clause language is sufficiently broad to require questions of arbitrability to be decided by arbitrators *in general*, it is clear that this cannot apply to Article 27.

### ii.   January 1, 2011 to 2012 Policy

This same interpretation—that the parties did not clearly and unmistakably delegate to the arbitrators the decision about whether MaidenRe is a Run-Off Reinsurer—also applies to the policy for January 1, 2011 to 2012. This is true despite the explicit exemption language that appears at the beginning of Article 28 in each of the subsequent policies ("Except as provided . . . ."). Interpreting this first policy otherwise would nullify Article 27(B)(7). Under that clause, if a Subscribing Reinsurer is not a Run-Off Reinsurer then the Arbitration Article is entirely inapplicable.[59] Given that Article 27 naturally precedes Article 28, there is no logical or linguistic interpretation of the policies that can give meaning to all of

---

58   ECF 11, at 3.

59   ECF 1-1, at 36–38, 79–81, 119–121, 160–162, 201–03.

the contracts' provisions if the arbitrators are the ones who determine whether Article 27 is applicable in the first instance. The specific exemption language added to the later policies makes this even more clear.

At a minimum, the 2011 to 2012 policy does not provide clear and unmistakable evidence in favor of delegation on this point. An interpretation that reads a provision out of a contract is not favored under Georgia's canons of construction. O.C.G.A. § 13-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part."); *Langley v MP Spring Lake, LLC*, 834 S.E.2d 800, 804 (Ga. 2019) ("In the face of ambiguity, we must look to the entirety of the [a]greement to determine the intent of the parties. Indeed, it is axiomatic that contracts must be construed in their entirety and in a manner that permits all of the terms contained therein to be consistent with one another.") (alteration in original) (internal quotation marks omitted) (citations omitted).

Accordingly, the Court concludes that the parties did not clearly and unmistakably delegate to the arbitrators the determination of whether a Subscribing Reinsurer is a Run-Off Reinsurer. The Court therefore turns to an analysis of whether MaidenRe is, in fact, a Run-Off Reinsurer under the Reinsurance Policies.

b.   **MaidenRe Is Not a "Run-Off Reinsurer" as Defined by the Reinsurance Policies.**

MaidenRe contends that it is not a Run-Off Reinsurer as that term is defined by the parties' contracts.[60] In support of this argument, MaidenRe relies on the Declaration of Michael Sheehan (the Sheehan Declaration).[61] Sheehan is a Senior Vice President at MaidenRe and is responsible for managing the company's portfolio of reinsurance business.[62] He is also a Senior Vice President at Enstar, MaidenRe's owner.[63]

According to Sheehan, MaidenRe engaged in reinsurance underwriting operations before its acquisition by Enstar and has continued to do so "[a]t all relevant times."[64] It is a "party to a number of ongoing, active reinsurance contracts" and "has not ceased its reinsurance underwriting operations."[65] Nor has MaidenRe transferred its claims-paying authority "to any unaffiliated entity"

---

[60]   ECF 3-1, at 8 ("MaidenRe does not qualify as a Run-Off Reinsurer under the Reinsurance Agreements and Builders may not avoid its contractual bargain to arbitrate on the basis of this contractual exception.").

[61]   ECF 3-2.

[62]   *Id.* ¶¶ 1, 4.

[63]   *Id.* ¶ 1.

[64]   *Id.* ¶ 7.

[65]   *Id.* ¶¶ 8, 9.

or "assigned its interests or delegated its obligations" under the Reinsurance Policies to any unaffiliated entity.[66] In short, the Sheehan Declaration attests that MaidenRe does not fit any of the categories of a Run-Off Reinsurer under the Reinsurance Policies.[67]

In opposition, Builders contends that MaidenRe meets the definition of a Run-Off Reinsurer under the second, third, and fifth definitions in the Reinsurance Policies.[68] First, Builders contends that MaidenRe has ceased underwriting operations. Second, Builders argues that MaidenRe's claims-paying authority has been transferred to an entity with which it was unaffiliated at the time the parties entered into the Reinsurance Policies. Finally, Builders asserts that MaidenRe has delegated various obligations to an unaffiliated entity.

In making these arguments, however, Builders ignores the clear language of the policies in favor of relying on internet definitions and public statements by MaidenRe's new owner. It is not for the Court to supplant clear contractual

---

[66]   *Id.* ¶¶ 10, 13.

[67]   *See generally* ECF 3-2.

[68]   "'Run-off Reinsurer' means any Subscribing Reinsurer that . . . . 2. has ceased reinsurance underwriting operations; or 3. has transferred its claims-paying authority to an unaffiliated entity; or . . . . 5. in any other way has assigned its interests or delegated its obligations under this Contract to an unaffiliated entity." ECF 1-1, at 36–37.

definitions with industry terms of art or public statements. Rather, the Court must interpret the language of the parties' contract.

### i.     MaidenRe Has Not Ceased Underwriting Operations.

Builders argues that MaidenRe has stopped underwriting because it no longer accepts new risk.[69] In support of that argument, Builders relies (among other things) on declarations proffered by Clifford Rich and Alexander T. Farley, which in turn rely on various public statements by Enstar and MaidenRe.[70] Specifically, the Rich Declaration quotes a document publicly filed by MaidenRe at the end of 2018 (after the Enstar purchase) as saying:

> The Company [MaidenRe] has no plans to write any new or renewal business. Its main focus will be the orderly administration of its discontinued business, including timely payment of claims and collection of reinsurance balances.[71]

To prepare his declaration, Farley reviewed Enstar's December 31, 2018 Form 10-K, which states:

> On December 27, 2018, we [Enstar] completed the acquisition of Maiden Reinsurance North America, Inc. ("Maiden Re North America") from a subsidiary of Maiden Holdings, Ltd. ("Maiden Holdings"). Maiden Re

---

69   ECF 7, at 11 ("Maiden has stopped 'underwriting' because it no longer accepts new risks.").

70   ECF 7-1, 7-3.

71   ECF 7-1, Rich Decl. ¶ 11 & Ex. E.

> North America is a diversified insurance company domiciled in Missouri that provides property and casualty treaty reinsurance, casualty facultative reinsurance and accident and health treaty reinsurance. As part of the transaction, we also novated and assumed certain reinsurance agreements from Maiden Holdings' Bermuda reinsurer, including certain reinsurance agreements with Maiden Re North America. . . . We will operate the business in run-off.[72]

The problem with Builders' arguments is that they ignore the actual contractual language at issue. The policies do not void the arbitration requirement when a reinsurer is in "run-off" as that term might be used in the insurance/reinsurance industry generally or in a public filing with a regulatory agency. The policies do not dictate that a Subscribing Reinsurer is a Run-Off Reinsurer if it ceases to accept new risk. Rather, the Reinsurance Policies tightly define the term as meaning any Subscribing Reinsurer that "has ceased reinsurance underwriting *operations*."[73] Builders provides no evidence that contradicts the testimony in the Sheehan Declaration that MaidenRe continues to engage in such operations.[74] And the declarations of Rich and Farley do not conflict with Sheehan's sworn statements. Whether MaidenRe continues to accept

---

[72]   ECF 7-4, at 3. *See also generally* ECF 7-3.

[73]   ECF 1-1, at 36–37 (emphasis added).

[74]   *Compare* ECF 3-2 *with* ECF 7-1 to 7-13.

new risk is therefore beside the point. If Builders had wanted to ensure that Subscribing Reinsurers that had stopped taking on new risk would qualify as Run-Off Reinsurers, it easily could have drafted the agreements to so state. It did not.

### ii. MaidenRe Has Not Transferred Its Claims-Paying Authority to an Unaffiliated Entity.

Builders contends that, after its acquisition by Enstar, MaidenRe transferred its claims-paying authority to Enstar and Cranmore.[75] And MaidenRe seems to concede this point to some extent.[76] Their disagreement here is ultimately over whether the entity to which MaidenRe transferred claims-paying authority had to be unaffiliated with MaidenRe (1) when the parties entered into the Reinsurance Policies or (2) at the time of the transfer of authority.

Unfortunately, Builders focuses on whether there *was* a transfer of such authority rather than the relationship between MaidenRe and the transferee at the time of the alleged transfer. Builders states: "Of course MaidenRe is affiliated with Enstar and Enstar's subsidiary Cranmore *now*, but that is not the point. It was a <u>material term</u> of the Reinsurance Contracts for MaidenRe to remain an ongoing

---

[75]   ECF 7, at 19.

[76]   ECF 11, at 13–14. *See also id.* at 14 ("[B]oth Enstar and Cranmore are indisputably *affiliated* with MaidenRe following the acquisition. . . . In order to qualify as a Run-Off Reinsurer, the company must delegate claims-paying authority to an *unaffiliated* entity.").

underwriting entity with the claims-payment record that MaidenRe had proven."[77]

MaidenRe is correct. The policies define a Subscribing Reinsurer as a Run-Off Reinsurer if it "has transferred its claims-paying authority to an unaffiliated entity."[78] This provision is not restricted to entities with which a Subscribing Reinsurer was unaffiliated at the time the Reinsurance Policies were formed. Therefore, the only reasonable way to read it is to refer to an entity with which the Subscribing Reinsurer was not affiliated at the time of the transfer of authority. "The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." O.C.G.A. § 13-2-3.

The Reinsurance Policies do not define a Run-Off Reinsurer as being a Subscribing Reinsurer that: At any point after the effective date of the policy transfers its claims-paying authority to an entity with which it was not affiliated as of the effective date. If the parties had intended for a Subscribing Reinsurer to come within this third policy definition of Run-Off Reinsurer if it was not affiliated

---

[77]   ECF 7, at 20.

[78]   ECF 1-1, at 36, 79, 119, 160, 201.

with the transferee entity as of the effective date of the Reinsurance Policies, they could have used language to do so. They did not.

### iii. MaidenRe Has Not Assigned Its Interests or Delegated Its Obligations Under the MaidenRe Insurance Policies to an Unaffiliated Entity.

Here, Builders makes similar arguments concerning MaidenRe's delegation of obligations/assignment of interests, focusing on the alleged transfer rather than the relationship between MaidenRe and Enstar (or Cranmore) at the time of the purported transfer.[79] As MaidenRe demonstrates, it has been affiliated with Enstar and Cranmore since its acquisition by Enstar.[80] Because Builders contends that any transfer by MaidenRe was made after that acquisition,[81] such transfer was necessarily made to an affiliated entity. As a result, Builders cannot establish that MaidenRe meets this or any of the other contractual criteria necessary to deem it a Run-Off Reinsurer under the Reinsurance Policies.

### c. Since MaidenRe Is Not in Run-Off, the Parties Must Arbitrate Their Dispute and this Action Will Be Stayed.

As discussed above, the only exception to the broad, mandatory arbitration clause in the Reinsurance Policies at issue here is the Run-Off Reinsurer provision

---

[79]   ECF 7, at 19–20.

[80]   ECF 11, at 14.

[81]   ECF 7, at 19.

in Article 27.[82] Since the Court concludes that MaidenRe is not a Run-Off Reinsurer, the arbitration requirement in Article 28 of the policies applies. The parties are therefore required to arbitrate the claims asserted in Builders' complaint, including whether those claims are arbitrable.[83]

The Court declines, however, to dismiss this action with prejudice. The Federal Arbitration Act proscribes that federal courts stay actions when the matter is referred to arbitration:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . .

9 U.S.C. § 3. Although MaidenRe has not made such an application, it does concede that stays in situations similar to this one are appropriate and that dismissal with prejudice is a matter of the Court's discretion.[84] The Court therefore

---

82   *See supra* at Section II., IV.b..

83   Although Builders' claim under O.C.G.A. § 33-4-6 for bad faith refusal to pay claims still appears to be viable, because MaidenRe paid the $1,970,000 sought by Builders in connection with the breach of contract claim (ECF 1-1, ¶¶ 42, 54), it is unclear whether any of that cause of action remains. Given the conclusions in this Order, however, this issue is for the arbitrators to address.

84   ECF 3-1, at 16, 17 n.4

exercises its discretion and stays this action pending the outcome of any arbitration between the parties.

## V.     CONCLUSION

MaidenRe's motion to amend the case caption [ECF 24] is **GRANTED**. The Clerk is **DIRECTED** to amend the name of Defendant in the case caption and on the docket to "Fletcher Reinsurance Company f/k/a Maiden Reinsurance North America, Inc."

MaidenRe's motion for leave to respond to Builders' new authorities [ECF 25] is **GRANTED**. The Clerk is **DIRECTED** to file MaidenRe's response [ECF 25-1] as a separate docket entry in response to Builders' notice of new authority [ECF 23].

Finally, and based on the foregoing discussion, Defendant's Motion to Compel Arbitration and Dismiss with Prejudice All Claims Against Maiden Reinsurance North America, Inc. [ECF 3] is **GRANTED IN PART** and **DENIED IN PART**. The Court concludes that the parties did not clearly and unmistakably delegate to the arbitrators the decision whether MaidenRe is a Run-Off Reinsurer. It is for the Court to make that determination. It finds that MaidenRe is *not* a Run-Off Reinsurer. Therefore, there is no contractual exception to arbitration that applies to the parties' dispute. Builders' claims must be arbitrated.

However, the Court declines to dismiss this action with prejudice. The parties are **DIRECTED** to file with the Court every 180 days after the date of this Order a joint status report concerning whether the arbitration is on-going. The clerk of court is **DIRECTED** to resubmit this Order to the undersigned every 180 days if the parties fail to comply with this directive. The parties are also **INSTRUCTED** to notify the Court within five business days if they resolve the dispute among them, whether through settlement or otherwise.

Finally, the clerk of court is directed to **ADMINISTRATIVELY CLOSE** this case. This closure is not a dismissal and does not preclude the filing of documents. The case may be re-opened if necessary.

**SO ORDERED** this the 26th day of February 2020.

Steven D. Grimberg
United States District Court Judge